**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **3:19-cr-00150-JBA-1** |
| | ) | |
| **LARRY E. PUCKETT** | ) | |
| | ) | |
| **Defendant** | ) | |

### SENTENCING MEMORANDUM OF LARRY E. PUCKETT

Jeffery B. Vaden
Bracewell, LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone:  (713) 221-1501
Facsimile:  (800) 404-3970
Email: jeff.vaden@bracewell.com
Texas State Bar No. 00791840
DCN Pro Hac Vice No. PHV10155*

*Counsel for Larry E. Puckett*

*Admitted Pro Hac Vice*

Larry E. Puckett ("Mr. Puckett"), through his undersigned counsel, submits this Memorandum to assist the Court in reaching an appropriate sentence. For the reasons set forth herein, a below-guidelines sentence is proper and just. Notwithstanding the seriousness and nature of the offense, given Mr. Puckett's acceptance of full responsibility for his minimal role in the same, his personal and family history and characteristics, and cooperation, as well as the promotion of respect for the law and a just punishment, the undersigned counsel respectfully suggests that a sentence of probation is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## I. INTRODUCTION

Larry Puckett accepts full responsibility for his conduct and comes now before this Court remorseful and to face the consequences of his actions. Indeed, this transgression is not at all characteristic of the life Mr. Puckett has lived. That Mr. Puckett was involved—even minimally—in the charged conduct is an aberration. Mr. Puckett has prided himself in living an exemplary life by putting family first as a dedicated husband and father. Mr. Puckett's has committed his life to caring for his loved ones, providing for his wife and disabled son, and participating as a contributing member of society by flourishing in his career. These attributes, together with Mr. Puckett's candor with authorities and his full acceptance of responsibility, are the characteristics that define Mr. Puckett. Mr. Puckett respectfully asks this Court to sentence him to a term of probation or to time-served, both of which are below the advisory Guidelines range.

Indeed, it is appropriate for court's to consider a defendant's history and characteristics at sentencing:

if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

Given Mr. Puckett's substantial assistance in the investigation and prosecution of others, his personal history and characteristics involving a lifetime of dedication to his career, his family, and complete acceptance of responsibility for the conduct that has brought him before this Court, a below-Guidelines range is appropriate.

On September 25, 2013, Mr. Puckett agreed to waive indictment, and, pursuant to a cooperation plea agreement, entered a guilty plea to a one-count Information in Criminal Case No. 3:19-cr-00150-JBA-1, on June 10, 2019.   As a result, Mr. Puckett promised—and has unequivocally fulfilled that promise—to cooperate unconditionally with the government as it investigated other individuals and entities for violation of, and conspiracy to violate, the Foreign Corrupt Practices Act.

Mr. Puckett has acknowledged that he conspired with others to violate the Foreign Corrupt Practices Act in violation of 18 U.S.C. § 371 and 15 U.S.C. § 78dd-2.  Specifically, Mr. Puckett admits to having conspired to attempt to wrongfully influence Indonesian officials, through the use of consultants, to award Alstom SA ("Alstom") a contract to construct a power plant in Indonesia (hereinafter "Tarahan" or the "Tarahan Project").[1]  Mr. Puckett has accepted complete responsibility for his minimal participation in the conspiracy, and he has acknowledged such wrongdoing before his family, friends, colleagues, and this Court.

---

[1]  Alstom is the parent company of Alstom Power, Inc. ("Alstom Power"), Mr. Puckett's former employer.

3

#6136274.1

Several factors support leniency in sentencing Mr. Puckett, not the least of which is his candor and substantial assistance with authorities, which helped the Government obtain the guilty pleas of at least two individuals in connection with Tarahan, and aided in the Government's prosecution and trial of Lawrence Hoskins ("Hoskins"), a former Alstom employee. The Government, likewise, acknowledges Mr. Puckett's cooperation, having agreed to recommend to this Court that Mr. Puckett's offense level be reduced by two levels based on Mr. Puckett's "prompt recognition and affirmative acceptance of personal responsibility for the offense."

Mr. Puckett fully accepts responsibility for his part in the Tarahan Project, but he urges this Court to focus on the totality of his life and character, the vital role he plays in the support of his family, the fact that this is his first and only violation of the law, and the fact that his involvement over a seven year period was limited to less than three months.[2]  For the reasons enumerated herein, a sentence of probation, or time served, is fair and just.

## II.        PERSONAL HISTORY

### A. Larry Puckett's Upbringing and Family

Mr. Puckett was born in 1949 in Dyersburg, Tennessee, a small town less than two hours from Memphis.  Three years later, in 1952, Mr. Puckett's family relocated to Nashville, where Mr. Puckett was raised.  One of four children, Mr. Puckett graduated from Antioch High School in 1967.

 Mr. Puckett's father, George Edward Puckett, was a decorated World War II veteran who spent three years serving our country in the South Pacific Theater.  He earned two Bronze Stars for bravery under fire.  A modest man of America's Greatest Generation who surely must have

---

[2] The Government alleges—and Mr. Puckett does not deny—that the conspiracy between Alstom and its consortium partner, Marubeni Corporation ("Marubeni") lasted for roughly seven years.

4

seen the horrors of combat, Mr. Puckett's father never spoke about his acts of bravery and heroism. Instead, exhibiting his trademark work ethic, Mr. Puckett's father continued to work tirelessly once he was honorably discharged from the United States Army in 1945. He took whatever jobs could put food on the table for his family: truck driver, sales, and manufacturing jobs in the aerospace sector.  For the last 25 years of his life, Mr. Puckett's father worked as a school bus driver.  He had only attained an eighth-grade education, but his work ethic and pride fueled him to provide what decent life he could for Mr. Puckett and his brothers and sister.  Larry Puckett's mom, Dorothy Lee, worked just as hard.  With just a tenth-grade education, she worked as a bookkeeper. Together, they provided a modest, loving home for Mr. Puckett and his two brothers and sister.

Having suffered from ███████████████, Mr. Puckett's father passed away unexpectedly in 1980 at the age of 65.  Mr. Puckett's mother was 81 years old when she died in 2013 ██ ████████████████████████████████████.  A devoted son, Mr. Puckett traveled frequently to Nashville during the last several months of her life to help care for her, both physically and financially.  Whether it was to administer her medications, assist with her several daily breathing treatments, cook, clean, or the myriad of other necessary household tasks, Mr. Puckett was by his mother's side during her final days.  During the period of her illness, which lasted roughly six months prior to her passing away, Mr. Puckett spent ███████████████ ████████████████████████████████████████████.

Throughout his adult life, Mr. Puckett has been a committed husband and father.  He met Sandra Kay MacDonald ("Mrs. Puckett") while working at a Tennessee Kmart in 1971 or 1972. They have been married for forty five (45) years.  They have one son, Justin, who is 35 years old. Both Mrs. Puckett and Justin are disabled and completely financially dependent on Mr. Puckett. Mrs. Puckett suffers from ██████████████████████████████████████████████████

#6136274.1

██████████████████████████████████████████████████

███████. She has been unable to work since 2002, depending completely on Mr. Puckett for financial support, and she has concentrated on caring for their son Justin as much as possible.

Their son, Justin, suffers from ████████████████████████████████

██████████████████████████████████████████████████

████████████████████████. As a result of his inability to work, Justin lives with his parents and completely depends on Mr. Puckett for all of his living expenses.

And there's Mr. Puckett himself who, despite being the backbone of his family, suffers

███████████████████████████████████████.[3]

Mr. Puckett fully accepts responsibility, and the story of his personal history is not meant to detract from or justify the charge he faces. The pain and embarrassment of the events associated with Tarahan, the count to which Mr. Puckett has pled guilty, and the sentence he faces affect his family and friends, colleagues old and new, himself, and very likely his livelihood. Mr. Puckett's good name and reputation are no longer intact and that is something he will have to live with for the rest of his life. Still, the last eight years Mr. Puckett has endured have been intense, ████████ and, for someone like Mr. Puckett, who has never before been in trouble with the law, frightening.

The pain and disruption that anything but a below-Guidelines probationary or time served sentence would have on Mr. Puckett's immediate family is incalculable. Without him, Mr. Puckett's wife and son will have no means of supporting themselves. Mr. Puckett's ability to continue seeking employment is crucial to his family's well-being. Further, a below-Guidelines sentence of probation, or time served, would help ensure that Mr. Puckett is able to keep working

---

[3] ██████████████████████████████████████████████████
████████.

#6136274.1

to support his family, a requirement given their reliance on him and his continued responsibility for their medical expenses.[4]

### B.  Larry Puckett's Military Service, Education and Career

Indeed, a life of work is pretty much all Larry Puckett has known.  Starting at the age of 9 mowing lawns and performing small household chores to working for the Nashville Board of Education at the age of 15 painting football fields, fences, and bleachers, to working full-time while he put himself through college.  Mr. Puckett has lived the three life lessons his parents tried so hard to instill in him: get a job, work hard and be good to your family.  Mr. Puckett has strived his whole life to deliver on these three promises, failing only in the events that bring him before this Court—something Mr. Puckett painfully regrets.

Mr. Puckett became interested in civil engineering while serving in the Naval Reserve.  For two years, from 1969 until 1970, Mr. Puckett served in the "Seabees" construction battalion where he exhibited a high aptitude for mechanical engineering.  He worked on base projects assisting in the design of buildings, runways, roads and bridges.  Mr. Puckett would have served our country longer, but a knee injury resulted in his honorable discharge from the Naval Reserve in late 1970.

After his military service, Mr. Puckett obtained his Bachelor of Science in Civil Engineering from Tennessee Tech University, and later, his Master's in Business Administration from the University of Tennessee. Starting in 1978, Mr. Puckett worked for Combustion Engineering for eleven (11) years.  In 1989, a multinational firm by the name of ABB acquired Combustion Engineering.  Mr. Puckett stayed on with ABB for the next twelve years, until 2002,

---

[4] ██████████████████████████████████████████████████████████
███████████████████████████████████.

when Alstom acquired ABB.  That is how Mr. Puckett came to work for Alstom and how Mr. Puckett ultimately found himself involved in the Tarahan project.

### III.    BACKGROUND FACTS RELATING TO OFFENSE CONDUCT

### A.    The Tarahan Project

In 2003, while living in Houston and working as a Regional Sales Manager for U.S.-based regional accounts for Alstom, Fred Pierucci ("Pierucci") recruited Mr. Puckett to travel to Sumatra, Indonesia to work on a project for Riau Andalan Pulp & Paper ("RAPP")—a private-entity power project.  Alstom Power at the time decided to bid the new Boiler Project to RAPP.  Although Alstom did not succeed in winning the RAPP project, Mr. Puckett's primary focus during the three months he worked in Indonesia was the RAPP project.

During the time Mr. Puckett worked on the RAPP project, Mr. Pierucci recruited Mr. Puckett to assist other Alstom Power employees on the Tarahan Project.  William Pomponi ("Mr. Pomponi"), the sales manager responsible for the Tarahan Project, was delayed in India and would be unable to lead and/or participate in meetings with Alstom's consortium partner, Marubeni, as well as possible meetings with Perusahaan Listrik Negara ("PLN"), the Indonesian state-controlled electricity company that sourced the Tarahan contract.  Mr. Pierucci asked Mr. Puckett to represent Alstom Power in Tarahan-related meetings until Mr. Pomponi was available.  At the time, Mr. Puckett was advised that his representation of Alstom on the Tarahan Project would only last for a few weeks.  During his time in Indonesia, Mr. Puckett worked primarily on the RAPP Project, representing the Alstom Power Boiler group on the Tarahan Project only as needed. All told, his time in Indonesia—both on the private-entity RAPP project and on the Tarahan Project—lasted less than three months.  Thereafter, Mr. Pomponi permanently replaced Mr. Puckett on the Tarahan Project in December 2003, when Mr. Puckett returned to his home in Houston, Texas—his

permanent residence prior to his temporary assignment in Indonesia.  Mr. Puckett had no involvement with the Tarahan Project before his three-month stint in Indonesia during 2003, and made only a handful of passing inquiries about Tarahan after his return to Houston.  And yet, those three months have the potential to literally destroy everything Mr. Puckett has worked so hard throughout his life to build.

Mr. Puckett is ashamed of his involvement in the Tarahan Project, and he accepts full responsibility for his participation in the charged conspiracy, but his involvement was minimal, something the Government concedes.

## IV.    SENTENCING GUIDELINES

### A. The Federal Sentencing Guidelines Are Advisory and Just One of Many Factors to Be Considered

Ever since *United States v. Booker*, courts have had the freedom to consider any relevant characteristic of an offense, a defendant or both.  543 U.S. 220, 226–27 (2005).  This Court may rightfully consider its own "sense of what is fair and a just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Post-*Booker*, factors such as a defendant's age, education, vocational skills, mental and emotional conditions, physical conditions, family and/or community ties, and civic, charitable and/or public service are all things a court must evaluate when determining "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  *See, e.g., United States v. Johnson*, 964 F.2d 124, 126 (2d Cir. 1992) (upholding district court's consideration of Johnson's sole responsibility for four young children); *Gall v. United States*, 552 U.S. 38, 59 (2007) (affirming district court's consideration of a defendant's age).  The "fullest information possible concerning the defendant's life and characteristics," should be considered.  *Pepper v. United States*, 562 U.S. 476, 480 (2011) (internal citations omitted).  The Court is not bound by limitations on Mr.

Puckett's "background, character, and conduct," which the court may consider for the purpose of imposing an appropriate sentence.  18 U.S.C. § 3661.  Indeed, sentencing courts are encouraged to exercise discretion in imposing fair and just sentences.  *See, e.g., Spears v. United States*, 555 U.S. 261 (2009) (reversing the Eighth Circuit Court of Appeals and clarifying that district courts have great discretion when sentencing defendants).  A downward variance from the Sentencing Guidelines is neither presumed to be unreasonable, nor does it require "extraordinary circumstances."  *United States v. Urena*, 425 Fed. Appx. 6, 9 (2d Cir. 2011).  *See also United States v. Verkhoglyad*, 516 F.3d 122, 136 (2d Cir. 2008) (justification for non-Guidelines sentence need not be "extensive or detailed").

The Court is "obliged to take account of [the Sentencing Guidelines] range along with the sentencing goals Congress enumerates in . . . 18 U.S.C. § 3553(a)."  *Cunningham v. California*, 549 U.S. 270, 286 (2007 (internal quotations omitted).  The Court may not presume that the sentencing guidelines range is reasonable.  *Nelson v. United States*, 555 U.S. 350, 352 (2009).  Further, Section 3553 directs the judge to consider sentences other than imprisonment.  *Gall*, 552 U.S. at 59.

In particular, 18 U.S.C. § 3553(a) requires a court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

[in the Sentencing Guidelines]

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission . . .;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

### 1.   The Guidelines Analysis

The parties agree that the applicable Sentencing Guidelines range exceeds the statutory maximum sentence of five years imprisonment pursuant to 18 U.S.C. § 371, therefore, the guideline term is 60 months for Mr. Puckett. (PSR ¶¶ 130.)   In determining an appropriate sentence, the question is what kind of punishment will serve to deter persons in the same position as Mr. Puckett.   The answer to that is no term of jail is required to provide general deterrence to persons who find themselves similarly situated as Mr. Puckett.   The humiliation and destruction of a respectable career and life is sufficient.

### 2.   The Probation Office's Pre-Sentence Investigation Report ("PSR")

### V.   THE 3553(A) FACTORS JUSTIFY NON-GUIDELINES SENTENCE

A.   <u>Mr. Puckett Substantially Assisted in the Government's Investigation of Alstom and Marubeni</u>

The Government agrees that Mr. Puckett has fully cooperated in the investigation of Alstom, Marubeni and the Tarahan Project.   Mr. Puckett worked with Alstom Power from 1999 until 2005, but only worked on the Tarahan Project intermittently on a "fill-in" over a three-month period during 2003.

11

Beginning in 2012, Mr. Puckett traveled to Washington, D.C. to assist the Government as it investigated Alstom and its consortium partner, Marubeni,[5] and their illegal influence of foreign officials in order to obtain the Tarahan contract. Alstom and Marubeni are accused of hiring two consultants to bribe Indonesian government officials in exchange for being awarded the Tarahan contract.[6]

Mr. Puckett has been entirely truthful, complete and reliable in his cooperation. Mr. Puckett has submitted to interviews with government attorneys and agents on several occasions. He has traveled to Washington, D.C. and New Haven, Connecticut from Houston, Texas approximately 15 times since 2012 for proffer and trial preparation sessions. Mr. Puckett has spent numerous hours cooperating in the investigations of Alstom, Marubeni, and their employees, answering investigators' questions, reviewing documents and emails, and providing relevant background information. Mr. Puckett has confirmed valuable information for the government, including details about how Alstom as an entity was structured, and how Alstom and Marubeni went about working together to bid for the Tarahan contract. Although Mr. Puckett's involvement in Tarahan was minimal, taking place sporadically over three months, Mr. Puckett had been employed with Alstom Power for several years and knew details about the internal corporate structure and operations of Alstom and Alstom Power.

Throughout interviews with the government over the last eight years, Mr. Puckett assisted in its investigation by corroborating details of the $118 million Tarahan contract with Perusahaan

---

[5] Marubeni worked with Alstom to obtain the $118 million dollar Tarahan Project contract. Alstom and Marubeni have agreed to pay a fines of $772 million and $88 million, respectively, to resolve the matter. Mr. Puckett has never been employed by or otherwise affiliated with Marubeni.

[6] Alstom hired the first consultant, Pirooz Sharafi ("Sharafi") in 2002. In 2003, Alstom and Marubeni hired a second consultant, Azmin Aulia ("Aulia").

Listrik Negara ("PLN"), the Indonesian state-controlled electricity company that sourced the Tarahan contract.  Mr. Puckett provided information about significant players connected to the Tarahan Project, including two consultants that Alstom and/or Marubeni hired to try and influence Indonesian officials.  As it relates to the two consultants, Mr. Puckett helped the government understand: (1) how Alstom and Marubeni employed the consultants; (2) the nature of the consultants' roles, responsibilities and duties in influencing PLN and Indonesian officials; (3) the consultants' ability to influence the awarding of the Tarahan contract to Alstom and Marubeni; and (4) details such as the consultants' commissions.

Mr. Puckett's substantial cooperation was crucial in helping the government prosecute and investigate the cases against Marubeni, Alstom, and executives with Alstom and Alstom Power, including Mr. Pierucci, Mr. Pomponi and Mr. Hoskins, to include testifying in *United States of America v. Lawrence Hoskins*, No. 3:12-cr-00238 (JBA) on October 31 – November 1, 2019.  The Second Circuit Court of Appeals has observed that the sentencing evaluation under 18 U.S.C. 3553(a) "includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation."  *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006).  A non-custodial sentence coupled with a felony conviction would more than sufficiently punish Mr. Puckett and would, at the same time, reinforce the notion that defendants who acknowledge their guilt and cooperate with the Government are doing the right thing, helping society, exhibiting true remorsefulness and contribution to the ends of justice.

B.   The Nature and Circumstances of Mr. Puckett's Offense Militate against a Custodial Sentence

Mr. Puckett accepts full responsibility for, and does not take lightly, his involvement in Tarahan.  That said, the nature of Mr. Puckett's involvement and minimal role support a sentence of probation or time served.  Such a sentence would be a serious, invasive and sufficiently

humiliating punishment for Mr. Puckett, and it would be sufficient to meet the purposes of sentencing and also be in the best interest of society.

It is undisputed that Mr. Puckett did not conceive Alstom and Marubeni's practice of employing agents to win the Tarahan Project.  Indeed, Mr. Puckett's involvement in Tarahan— which took place more than 16 years ago—was limited to involvement over three months in 2003 while actually working on a different and unrelated Alstom project in Indonesia.  That Mr. Puckett was involved in Tarahan at all is somewhat of a fluke—he was filling in on Tarahan at the request of an Alstom Supervisor (Fred Pierucci) until another Alstom manager, Bill Pomponi, could return to Indonesia and take over the project full-time.  Thus, while Mr. Puckett was aware of and knew of the agents and their illicit roles in assisting Alstom to secure the Tarahan contract, it is important to consider that Mr. Puckett did not devise the plan to employ agents, never made or directed payments to the agents (or to members of PLN or Indonesian parliament), never discussed payments with the agents, and was not involved in the details surrounding the same.

      C.      A Sentence of Probation is Sufficient but Not Greater Than Necessary to Fulfill the Statutory Goals of Sentencing under 18 U.S.C. § 3553(a)

In *Gall*, the Supreme Court recognized that probation can be an appropriate sentence in any case regardless of the advisory guideline level so long as it is not otherwise prohibited by law. 552 U.S. at 59.  The Court also noted that probation is a punishment involving substantial deprivations of and restrictions on defendants' liberties.  Such limitations include the ability of a person under the sentence of probation to move freely or change jobs.  Likewise, someone on probation is under supervision which requires, among other things, reporting and permitting unannounced home visits by probation officers.  *Id.* at 48.  These are not trivial conditions and substantially affect the probationer's freedom.  The decision in *Gall* echoes and affirms Congress' original intention expressed in 18 U.S.C. 994(j) that the guidelines should reflect the general

appropriateness of imposing a sentence other than imprisonment in a case involving a first offender who has not committed a violent or otherwise serious crime.

The devastating consequences of a federal criminal conviction are in and of themselves, without a term of prison, enough in this case to reflect the seriousness of the offense and promote respect for the law.  As outlined above, the conviction in this case has already and will have in the future such dire consequences in Mr. Puckett's life, that just punishment for the offense has been accomplished.

D.  <u>Mr. Puckett's Personal History, Characteristics and Commission of a Nonviolent Offense Warrant a Lower Sentence</u>

Other than this transgression, Mr. Puckett is a law-abiding citizen.  He is neither a repeat offender nor a career criminal.  On the contrary, he is a hard-working person who comes from a close family of hard-workers who have never faced the possibility of a family member serving time in prison.  A sentence of probation, or time served, for a person like Mr. Puckett—who wants only to be a father to his child and a provider for his wife—will certainly deter him from even the thought of future criminal conduct.

Larry Puckett's personal history, background and characteristics are crucial considerations in his sentencing and warrant a non-Guidelines sentence of probation, at worst.  But for this one offense, this Court is faced with an individual who has an unblemished criminal history.  The spirit of 18 U.S.C. § 3553(a) as modified by *Booker* is that district courts impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing:  promotion of respect for the law; just punishment for the offense; deterrence to criminal conduct; and protection of the public from further crimes.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (listing the goals and factors of § 3553(a)).  *See also Gall*, 552 U.S. at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

15

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)).

Mr. Puckett's full acceptance of responsibility, personal history and characteristics do not diminish the nature of his conduct, but rather, warrants that this Court exercise leniency when sentencing Mr. Puckett.

### 1.   Mr. Puckett is the Sole Family Provider and a Committed Family Man.

A custodial sentence would be disastrous for Mr. Puckett's wife and son, whom both depend on him completely, financially and otherwise.  As detailed above, no one else has the ability to care for Mrs. Puckett and Justin should Mr. Puckett be sentenced to imprisonment.  Mrs. Puckett's ███████████████████████████████.  Mr. Puckett performs all of the day-to-day, manual tasks for the family's home, as Mrs. Puckett's ███████ ████████████████████████████████████████████████████████████ ███████████████████.  Their son, Justin, ████████████████████████████, requires care from both Mr. and Mrs. Puckett.  Any sentence more severe than probation would test Mrs. Puckett's ability to care for herself, let alone her ability to care for Justin.  And the truth is, Mr. Puckett needs his family, too, for their love and support, and he is fortunate that he will have a strong network of family and friends throughout this difficult time.  *See United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008) (affirming downward variance based in part on being a "devoted husband, father and son").

A defendant's role as a sole caretaker and source of financial support for dependent family members may warrant downward variances.  *See United States v. Munoz-Nava*, 524 F.3d 1137, 1143-44 (10th Cir. 2008) (affirming downward variance in part because defendant was primary

caretaker and sole supporter of his son). Courts in this Circuit have "the authority to depart downward for extraordinary family circumstances, including parental responsibilities." *United States v. Ekhator*, 17 F.3d 53, 55 (2d Cir. 1994). And courts in this Circuit and others routinely consider a defendant's family ties in considering whether to impose a below-Guidelines sentence. *See United States v. Deutsch*, 104 Fed. Appx. 202, 203 (2d Cir. 2004) (affirming a sentence granting a downward departure from a Guidelines range of twelve-to-eighteen months imprisonment to a prison sentence of three months); *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (finding that when hardship on the family is exceptional, a court may depart downward on that basis)*; Johnson*, 964 F.2d at 126 (upholding district court's consideration of Johnson's sole responsibility for four young children); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (affirming a court's downward departure in sentencing a man who worked two jobs and whose family—a wife, two daughters, a grandmother, and his disabled father—all depended on him).[7]

In *Galante*, the sentencing court felt that "if the defendant were imprisoned the family unit would probably be destroyed, and defendant's wife and children relegated to public assistance . . . ." *Galante*, 111 F.3d at 1135. Galante was married with two children, and although he and his wife both worked, her employment opportunities were limited. *See id.* at 1032. Like Mr. Puckett,

---

[7] Indeed, courts in other Circuits agree with the courts in the Second Circuit. *See, e.g.*, *United States v. Whitehead*, 532 F.3d 991, 992-93 (9th Cir. 2008) (en banc) (affirming a sentence of probation, 1,000 hours of community service, and restitution in lieu of 41 months to 51 months of imprisonment due, in part, to the defendant's eight-year old daughter's dependence on him); *United States v. Khan*, No. 07-CR-623, 2010 WL 610534, at *2 (E.D.N.Y. Feb. 19, 2010) (probation where guidelines recommended 87 to 108 months, and noted that the defendant's "presence at home is necessary for the care of her four children"); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *4 (N.D. Ill. Feb. 3, 2005) (sentencing the defendant to a lower non-Guidelines sentence, in part, because of his good relationship with his children).

Galante's family depended almost exclusively on him.  *See id.*  And like *Galante*, Mr. Puckett's family circumstances are so exceptional as to warrant a downward departure.  *See id.*

Mr. Puckett's commitment to his family is unquestioned.  Mr. Puckett's exigent family circumstances warrant a below-Guidelines sentence.

### 2.    Mr. Puckett Is a Hard-Working, Contributing Member of Society

Without minimizing the charged offense or his involvement in the same, Mr. Puckett, whom has led an otherwise exemplary life and shown positive personal characteristics throughout the course of his life, committed a nonviolent offense.  Mr. Puckett has no other negative history— no substance abuse, other crimes, incarceration, instability—that would justify anything other than a non-incarceration sentence.  *See United States v. Autery*, 555 F.3d 864, 869 (9 Cir. 2009) (affirming court's sentencing defendant, sua sponte, to probation in child pornography case in part because of defendant's "redeeming personal characteristics: no history of substance abuse, no 'interpersonal instability,' no 'sociopathic or criminalistic attitudes,'" and his motivation and intelligence, including his support of his wife and child); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (affirming district court's downward variance, which was based, in part, on defendant being a "model citizen and a good father and teacher," which the court noted was a valid consideration under 3553); *United States v. Willis*, 479 F. Supp. 2d 927, 932 (E.D. Wis. 2007) (finding "the guideline-recommended term failed to account for defendant's significantly positive personal characteristics," including graduation from high school and a solid work record).

Mr. Puckett's military service in the United States Naval Reserve is, likewise, a mitigating factor for the Court to consider as a 3553(a) factor and the imposition of a downward variance. *See Kimbrough*, 552 U.S. at 110 (affirming variance and ruling Court could vary downward because defendant had "served in combat during Operation Desert Storm and received an

18

honorable discharge from the Marine Corps"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming 6-level downward departure based in part on defendant having volunteered for the Marine Corps as a college student and "honorably served his country for six years, mostly in the active reserves"); *Howe*, 543 F.3d at 139  (affirming sentencing court's below-Guidelines sentence based, in part, on defendant's military service).

A non-custodial sentence is also appropriate given Mr. Puckett's current and past career and financial situation. ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████.

A sentence that is longer than necessary would have at least two adverse effects:  First, it further damages his prospects for future employment, which is already daunting as a 70 year old convicted felon. Second, anything other than a non-Guidelines sentence would "wreak extraordinary destruction" on Mr. Puckett's family, career and life. *Johnson*, 964 F.2d at 129.  Mr. Puckett is the sole supporter of his wife and son, both of whom are completely dependent on him. Mr. Puckett's incarceration would like mean that his wife and son would have to turn to government assistance for their survival, a matter that although "not by itself a ground for departure" is a matter "worth considering".  *Galante*, 111 F.3d at 1035.

19

3.   **Mr. Puckett's Age and Low Propensity to Reoffend Justifies a Non-Guidelines Sentence**

At 70 years of age and with no prior arrests or crimes, Mr. Puckett— does not pose a risk to the public.  He will not reoffend.  *See United States v. Lucania*, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) (finding that "[p]ost-*Booker* courts have noted that recidivism is markedly lower for older defendants").  Mr. Puckett's extensive cooperation, lack of prior record and rehabilitation efforts show that he understands the gravity of his actions.  He is not a threat to repeat this crime, or any other.

Further, there is evidence that probation would have a strong deterrent effect.  *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend."); *United States v. Robinson*, No. CRIM.A. 13-436 JLL, 2014 WL 1400197, at *6 (D.N.J. Apr. 9, 2014) (affirming trial court's decision to grant downward variance, and noting court's consideration of deterrent effects of both incarceration and probation and court's decision that probation was more appropriate because it forced defendant to complete community service that "might make his punishment more visible to the general public").

Further, a below-Guidelines sentence is appropriate given all the factors enumerated herein, taking into consideration that "probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'"  *Gall*, 552 U.S. at 44.

Finally, regardless of the sentence Mr. Puckett serves, the collateral consequences he faces will be harsh, severe and will follow Mr. Puckett for the rest of his life.  It is likely that, as a result of his conviction, it will be difficult for Mr. Puckett to find gainful employment in the only career field Mr. Puckett has ever known—a consequence that will certainly have dire consequences on

20

Mr. Puckett and his family.  *See United States v. Vigil*, 476 F. Supp.2d 1231, 1235 (D.N.M. 2007) (affirming downward variance where defendant in public corruption case was already punished by loss of his position and reputation).  Further, Mr. Puckett, who had never before run afoul of the law, is now a convicted felon who has brought shame upon himself.  Of course, such acts were Mr. Puckett's and he blames no one but himself.  It is befitting of the crime, but not of the man who committed it.  The behavior and conduct to which he has pleaded guilty are inconsistent with the manner in which Mr. Puckett has otherwise conducted his life.

## VI.    CONCLUSION

Mr. Puckett appears before this Court remorseful for his conduct, and submits that for all the reasons stated herein, a sentence of probation or time served is just, appropriate and fully in accord with 18 U.S.C. § 3553, the United States Sentencing Guidelines, and his extensive cooperation.

Respectfully Submitted,

BRACEWELL LLP

By:   */s/ Jeffery B. Vaden*
        Jeffery B. Vaden
        Texas State Bar No. 00791840
        DCN Pro Hac Vice No. PHV10155
        711 Louisiana Street, Suite 2300
        Houston, Texas 77002
        Telephone:  (713) 221-1501
        Facsimile:  (800) 404-3970
        Email: jeff.vaden@bracewell.com

*Counsel for Larry E. Puckett*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2020, a true and correct copy of this document was delivered via the Court's CM/ECF system to all parties.

Dated: March 9, 2020

*/s/ Jeffery B. Vaden*

22

#6136274.1